UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | )  | |
|---|---|---|
| **JAMES LACROIX, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 19-cv-11463-DJC |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| **BOSTON POLICE DEPARTMENT,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                    **March 24, 2022**

**I.   Introduction**

Plaintiffs James LaCroix ("LaCroix"), Renee Payne-Callender ("Payne-Callender"), the Boston Police Patrolmen's Association ("BPPA"), the Boston Police Detectives Benevolent Society ("BPDBS") and the Boston Police Superior Officers Federation ("BPSOF") (collectively, "Plaintiffs") have filed this lawsuit against the Boston Police Department ("BPD") alleging disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 2112(d) ("ADA") (Count I), handicap discrimination under Mass. Gen. L. c. 151B, § 4 (Count II), and genetic information discrimination under Mass. Gen. L. c. 151B, § 4(19) (Count III). D. 1. Specifically, Plaintiffs challenge BPD's policy requiring medical and psychological examinations for all officers who return from extended leave, regardless of the nature of their leave or job duties. Id. ¶ 1. Plaintiffs have now moved for partial summary judgment on Count I, D. 40,[1] and BPD

---

[1] Although Plaintiffs have captioned their motion as a motion for summary judgment, they seek summary judgment as to Count I only. D. 40 at 1.

1

has filed a cross-motion for partial summary judgment, D. 47.[2] For the reasons stated below, the Court ALLOWS Plaintiffs' motion for partial summary judgment, D. 40, and DENIES BPD's cross-motion for partial summary judgment, D. 47.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997). "Conclusory allegations, improbable inferences, and unsupported speculation," however, are "insufficient to establish a genuine dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737

---

[2] BPD has filed an "opposition and a cross-motion." D. 47. Although BPD states that it "seeks dismissal on all Counts," id. at 2, BPD's motion addresses Count I, the ADA claim, only. D. 47 at 5-11. Accordingly, the Court considers BPD's motion as a motion for partial summary judgment as to Count I.

F.3d 144, 146 (1st Cir. 2013) (citation and internal quotation mark omitted).

**III.     Factual Background**

Although the Court previously addressed the allegations in this case in denying BPD's motion to dismiss, the Court has the cross motions for summary judgment before it on a more developed record[3] and, unless otherwise noted, the following facts are undisputed.[4]   LaCroix joined BPD in 2004 and he currently works as a patrol officer.  D. 41 at 3, 21.  Payne-Callender is a detective, id. at 3, and it appears that she has worked for BPD since at least the "early 1990s."  See D. 41 at 38.  The BPPA is the collective bargaining agent for all BPD patrol officers, including LaCroix.  D. 1 ¶ 6.  BPDBS is the collective bargaining agent for all BPD detectives, including Payne-Callender.  Id. at ¶ 7.  BPSOF is the collective bargaining agent for all BPD uniformed sergeants, lieutenants and captains.  Id. at ¶ 8.

Although BPD "does not have a written policy" regarding examinations following extended leaves of absence, it is "[BPD's] consistent practice" that officers must be cleared by at least one BPD clinician before they may return to work after an extended leave.  D. 41 at 16 (letter dated December 20, 2018 from BPD Deputy Superintendent Steven Whitman).  Specifically, BPD Superintendent James G. Hasson ("Hasson") attests that officers who have been on leave for three or months must undergo a physical examination by a BPD clinician prior to returning to work.

---

[3] The record now includes answers to interrogatories, D. 41 at 18–48, and the affidavits of BPD Superintendent James G. Hasson, D. 47-1, and BPD psychiatrist Andrew Brown, D. 47-2.

[4] BPD did not submit its own statement of material facts as required by Local Rule 56.1.  In BPD's response to Plaintiffs' statement of material facts, BPD asserts that it "does not dispute the Plaintiffs' brief statement of material facts."  D. 47 at 2.  Accordingly, Plaintiffs' statements are deemed admitted for summary judgment purposes.  See Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (quoting D. Mass. L.R. 56.1) (providing that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by the opposing parties unless controverted by the statement required to be served by opposing parties").

D. 47-1 ¶ 14 (Aff. of Superintendent James G. Hasson); see D. 41 at 16.  Additionally, officers who have been on leave for six months must also undergo a psychological examination performed by BPD psychiatrist Andrew Brown, M.D. ("Dr. Brown").  Id. at ¶ 15; see D. 41 at 16.

On March 6, 2015, LaCroix sustained back and hip injuries while he was on duty.  D. 41 at 26.  LaCroix was placed on leave due to his injuries, id. at 3, and remained out of work until he was cleared to return by his doctors in December 2018, D. 1 ¶ 10.  While he was recovering, LaCroix met with BPD's occupational physician, Deiter Affeln ("Dr. Affeln").  D. 1 ¶ 11.  The examinations by Dr. Affeln focused on LaCroix's leg and back injuries and he cleared LaCroix to return to light duty work with restrictions on December 4, 2018.  Id.  Around that time, LaCroix was informed that he would also be required to be examined by BPD's psychiatrist, Dr. Brown, before returning to work because he had been on leave for more than six months.  Id. at ¶ 12.  LaCroix complied and met with Dr. Brown on December 13, 2018.  Id. at ¶ 13.  During the examination, Dr. Brown explained that LaCroix was required to undergo the psychological examination because he had been on leave for more than six months.  D. 41 at 22.  LaCroix asked Dr. Brown whether anyone at BPD had raised concerns regarding his mental health and Dr. Brown replied that he was not aware of any such concerns.  Id.  at 23.  Subsequently, Dr. Brown approved LaCroix's return to work.  D. 1 ¶ 13.

Payne-Callender went on extended leave, D. 41 at 3, after she injured her right Achilles tendon while on duty on February 28, 2018, id. at 39.  Payne-Callender was eventually cleared to return to work by her doctor on January 11, 2019.  D. 1 ¶ 15.  While recovering, Payne-Callender occasionally met with BPD's Medically Incapacitated Section regarding her injury.  Id. at ¶ 16.  Eventually, BPD registered nurse Zelma Greenstein examined Payne-Callender and cleared her as physically able to return to partial duty.  D. 41 at 33.  Sometime thereafter, BPD informed Payne-

Callender that she would not be fully cleared to return to work without a psychological examination by Dr. Brown. Id. Payne-Callender complied and met with Dr. Brown on January 31, 2019. D. 1 ¶ 19. During the examination, Dr. Brown explained that Payne-Callender was being examined "due to the length of time that [she had] been out of work." D. 41 at 33. Payne-Callender asked whether anyone at BPD had raised concerns regarding her mental health and Dr. Brown informed her that they had not. Id. at 3. Subsequently, Dr. Brown cleared Payne-Callender to return to work. D. 1 ¶ 19.

Plaintiffs do not dispute, as BPD Superintendent Hasson attests, that police officers experience frequent exposure to job-related stress and traumatic events. D. 47-1 ¶ 18. "Law enforcement is a safety-sensitive occupation: the essential duties of the occupation necessarily imply that the risks associated with mental dysfunction in law enforcement officers are extremely high." D. 47-2 ¶ 8 (Aff. of Dr. Andrew Brown). "[T]he risks associated with functional decline among police officers entail not only the personal health and well-being of the individual police officer but also directly impact the health and well-being of the public." Id. Plaintiffs allege, however, that the blanket requirement for a physical examination after three-month leave and an additional psychological examination after six-month leave violates the ADA.

IV.    **Procedural History**

Plaintiffs instituted this action against BPD on July 3, 2019. D. 1. This Court denied BPD's motion to dismiss. D. 20. Plaintiffs and BPD have each moved for partial summary judgment on Count I, disability discrimination under the ADA. D. 40; D. 47. The Court heard the parties on the pending motions and took the matters under advisement. D. 49.

**V.     Discussion**

   **A.     <u>Americans with Disabilities Act</u>**

Plaintiffs allege that BPD's policy requiring all officers to undergo physical examinations after three months of leave and, after six months of leave, an additional psychological examinations violates the ADA, D. 1 ¶¶ 24–26, specifically 42 U.S.C. § 12112(d)(4)(A).

   *1.     ADA Violation*

Plaintiffs challenge BPD's extended leave policies on the grounds that the required examinations apply to an overly broad class of officers, regardless of the reason for the leave or an officer's specific job assignment. D. 41 at 5–8. Specifically, Plaintiffs object to BPD requiring post-leave examinations that are "unrelated to workplace injuries." D. 41 at 5 & n.1.[5] In doing so, Plaintiffs rely upon Section 12112(d)(4)(A) of the ADA and case law, including <u>Port Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. & N.J.</u>, 283 F. Supp. 3d 72 (S.D.N.Y. 2017) (hereinafter, "<u>Port Authority</u>"). <u>Id.</u> at 6–8. Similar to the examinations at issue here, the relevant policies in <u>Port Authority</u> required all police officers to undergo fitness-for-duty examinations following injuries or illnesses. <u>Port Authority</u>, 283 F. Supp. 3d at 88-89 (granting summary judgment for plaintiff as to the claim for fitness-for-duty examinations for sick leave for more than five days violated the ADA).

In response, BPD spends a lot of time arguing that the ADA does not apply here because LaCroix and Payne-Callender have not shown they are disabled. D. 47 at 5–7. BPD raised this same argument in its motion to dismiss, which the Court denied. D. 20 at 8–10; <u>LaCroix v. Bos. Police Dep't</u>, 454 F. Supp. 3d 97, 104–05 (D. Mass. 2020) (concluding that "Plaintiffs are not

---

[5] "[P]laintiffs do not challenge any BPD policy requiring that officers suffering from a work-related injury may be subjected to an examination to determine that the workplace injury is resolved." <u>Id.</u> at 5 n.1.

required to establish that they have a disability to challenge BPD's medical and psychological examination policy under 42 U.S.C. § 12112(d)")). Specifically, BPD continues to contend that Plaintiffs have not established a *prima facie* case for disability discrimination or shown pretext under the McDonnell Douglas framework. D. 47 at 5 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under McDonnell Douglas, to establish a *prima face* case of discrimination, the plaintiff must show: "(1) that she was 'disabled' within the meaning of the ADA; (2) that she was able to perform the essential functions of her job with or without accommodation; and (3) that she was discharged or adversely affected, in whole or in part, because of her disability [(i.e., suffered an adverse employment action)]." López-López, 958 F.3d at 104 (alteration in original) (quoting Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 82 (1st Cir. 2008)).

As this Court has previously noted, LaCroix, 454 F. Supp. at 104–05, BPD's argument is not consistent with case law. Although McDonnell Douglas generally applies in employment discrimination cases lacking direct evidence of discriminatory animus, Mancini v. City of Providence, 909 F.3d 32, 38 (1st Cir. 2018), courts have consistently ruled that this burden-shifting framework does not apply to medical inquiry claims brought under Section 12112(d)(4)(A) of the ADA, see, e.g., Coffey v. Norfolk S. Ry. Co., 23 F.4th 332, 336 n.1 (4th Cir. 2022) (noting that "[o]ther circuits to address this issue have found that improper medical inquiry claims under the ADA § 12112(d)(4)(A) stand apart from general claims of discrimination under § 12112(a) and do not require the plaintiff to show he is disabled" (citations omitted)); Wright v. Illinois Dep't of Child. & Fam. Servs., 798 F.3d 513, 522 (7th Cir. 2015); Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1311 (11th Cir. 2013) (concluding that "§ 12112(d)(4)(A) protects employees who are not disabled"); Kroll v. White Lake Ambulance Auth., 691 F.3d 809, 816 (6th Cir. 2012); Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007); Conroy v. New York State Dep't of Corr. Servs.,

333 F.3d 88, 94–95 (2d Cir. 2002); Roe v. Cheyenne Mountain Conference Resort, 124 F.3d 1221, 1229 (10th Cir. 1997). This Court agrees that it "makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether or not he has a disability." Cossette v. Minnesota Power & Light, 188 F.3d 964, 969 (8th Cir. 1999) (quoting Griffin v. Steeltek, Inc., 160 F.3d 591, 594 (10th Cir. 1998)); LaCroix, 454 F. Supp. 3d at 104-05. Plaintiffs, therefore, still do not need to show they are disabled for the purposes of bringing their claim under Section 12112(d)(4)(A) claim under the ADA. See Coffey, 23 F.4th 336 n.1; LaCroix, 454 F. Supp. 3d at 104-05.

Instead of relying upon the burden shifting framework, Plaintiffs claim here that the BPD policy violates 42 U.S.C. § 12112(d)(4)(A), which provides that "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." Id. Here, where there is no debate that BPD is a "covered entity" and, as discussed above, Plaintiffs need not allege that they are disabled to invoke Section 12112(d)(4)(A), resolution of this matter turns upon whether the examination required under the BPD policy is job-related and consistent with business necessity, a burden that is on BPD to satisfy.

2. *Business Necessity Exception*

"[A]n employer may be justified in requiring a medical examination of a current employee so long as it is shown to be 'job-related and consistent with business necessity.'" López-López v. Robinson Sch., 958 F.3d 96, 105 (1st Cir. 2020) (citing Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 672 (1st Cir. 1995) (quoting 42 U.S.C. § 12112(d)(4)). The parties here do not separately address whether examining officers' fitness-for-duty under the BPD policy is "job-related" and based upon the present record, there is nothing to suggest that the parties have a basis for disputing

8

that the examinations are arguably job related given the role that police officers play in ensuring public safety. D. 47-1 ¶ 18 (noting that job "places [BPD] officers in a unique situation of not only having to be physically fit, but also requires them to maintain the mental stamina to perform their job").

Even accepting *arguendo* that the BPD blanket policy regarding examinations for officers returning from leave is job-related, BPD still must show that its examination requirement is consistent with business necessity. That is, BPD "bears the burden to show the asserted 'business necessity' is vital to the business and the request for a medical examination or inquiry is no broader or more intrusive than necessary." Thomas, 483 F.3d at 527 (citing Conroy, 333 F.3d at 97–98). "The business necessity standard is quite high, and is not [to be] confused with mere expediency." Conroy, 333 F.3d at 97 (alteration in original) (quoting Cripe v. City of San Jose, 261 F.3d 877, 890 (9th Cir. 2001)). "[A]n examination that is 'job-related' and 'consistent with business necessity' must, at minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue." Tice v. Centre Area Transp. Auth., 247 F.3d 506, 515–19 (3d Cir. 2001) (concluding that post-leave examination of bus driver was consistent with business necessity where the employee's condition had previously interfered with his ability to drive a bus, employer had received complaints about the employee's reckless driving, and the employee's own assessment of his condition formed the basis of the diagnosis from his personal physician). "[A] medical examination is job related and consistent with business necessity if the employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition." Painter v. Ill. DOT, 715 Fed. Appx. 538, 540–41 (7th Cir. 2017) (citing EEOC, Enforcement

9

Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA, (July 27, 2000), https://www.eeoc.gov/policy/docs/guidance-inquiries.html#6 last visited March 21, 2022) (concluding that examinations were job related and consistent with business necessity where the employer had received several complaints that the employee was aggressive and threatening toward co-workers); see Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811–12 (6th Cir. 1999) (concluding that examinations satisfied the business necessity standard where the "[employee]'s behavior had given the school district reason to seek further information about his fitness for continued employment").

BPD argues that it has a business necessity for requiring examinations prior to officers returning to work after an extended leave. D. 47 at 8–10; D. 47-1 ¶ 19 (asserting that "it is incumbent upon the department to complete an assessment of the individual's physical and mental well-being before returning the officer to active duty"). Police officers face "unique stressors" on the job, D. 47-1 ¶ 19, and BPD "needs to ensure that the officers assigned to its neighborhoods and those patrolling the streets are fully capable of performing the duties required of a police officer to the best of their abilities." Id. at ¶ 17. Additionally, BPD argues that "[m]ental health issues are often overlooked and underreported," which, in the context of armed police officers, could have very serious consequences for the safety of officers and the public. See D. 47 at 9–10; D. 47-1 ¶ 17; D. 47-2 ¶ 9. "[T]here is no mechanism (beyond the BPD Evaluation process) to ensure that officers who have been exposed to serious mental or physical illness, combat—as well as a range of other extremely adverse conditions or situations—are properly assessed prior to returning to full duty." D. 47-2 ¶ 9.

According to Dr. Brown, BPD's policy "is based on medical evidence that indicates that separation from the workplace is very strongly associated with negative impacts on mental health

and functionality." D. 47-2 ¶ 4 & n.1 (citing Greg P. Couser et al., Is Separation from the Workplace a Psychiatric Emergency? The Role of the Clinician and the Consultant, 51 PSYCHIATRIC ANNALS, 58 (2021), https://doi.org/10.3928/00485713-20210105-02 (last visited March 21, 2022) (hereinafter, "Separation from the Workplace")). Dr. Brown's "estimate[s] that 75% or more [of] officers characterize their absence from work as 'very stressful' or 'very challenging.' A significant percentage of officers would describe the impact of work absence [as being] as challenging or 'stressful' as the illness (or other circumstance) that caused the work absence." Id. at ¶ 4. Dr. Brown further states that "the risks associated with functional decline among police officers entail not only the personal health and well-being of the individual police officer but also directly impact the health and well-being of the public." Id. at ¶ 8.

It is undisputed that police work requires that officers are physically and mentally fit. D. 41 at 10 (stating that "[t]he plaintiffs do not dispute that the BPD has a need to ensure each and every officer is fit to carry a weapon" (internal quotation marks omitted)). The Court, however, agrees with Plaintiffs that BPD has failed to establish business necessity to justify subjecting all officers to physical examination and/or psychological examination after three months and six months, respectively, when unrelated to an injury that caused the leave from the job. See id. BPD points to Brownfield v. City of Yakima, 612 F.3d 1140 (9th Cir. 2010) and Watson v. City of Miami Beach, 177 F.3d 932 (11th Cir. 1999) to support its position that its blanket policy regarding such post-leave examinations are job related and constitute a business necessity because, in the law enforcement context, "an employee's mental health, if left untended, may create a public safety hazard." D. 47 at 10. Unlike this case, however, Brownfield and Watson both involved fitness-for-duty examinations of individual police officers whose conduct raised specific concerns about their particular abilities to perform their duties as police officers. See Brownfield, 612 F.3d at

1142, 1146–48 (stating that the officer repeatedly exhibiting "emotionally volatile behavior" formed "an objective, legitimate basis to doubt [his] ability to perform the duties of a police officer"); Watson, 177 F.3d at 935 (noting that where a police officer overacted many times and his colleagues had expressed concern he was paranoid, "[such] evidence showed the City had good cause for concern as to whether Watson was fit to be a police officer").

Unlike Brownfield and Watson, BPD's policy applies to all officers returning from an extended leave, D. 47-1 ¶¶ 14–15, even where there are no specific concerns about an individual's ability to perform their job duties, D. 41 at 22–23, 33 (stating that BPD required LaCroix and Payne-Callender to undergo psychological examinations even though there were no concerns about the officers' mental fitness), as there were in those cases. BPD's reliance on Brownfield and Watson, therefore, is unavailing. See Franklin v. City of Slidell, 936 F. Supp. 2d 691, 713 (E.D. La. 2013) (noting that "several circuit courts have indicated that[ ] the business necessity standard may be met *before an employee's work performance declines* if the employer is faced with 'significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job . . . [but] there must be genuine reason to doubt whether that employee can perform job-related functions'" (emphasis added in Franklin) (quoting Brownfield, 612 F.3d at 1146)).

Additionally, BPD has failed to present any evidence to establish that being on leave for three months or six months causes increased risk for physical and/or psychological conditions, respectively, that could negatively impact an officer's job performance. As noted above, BPD claims that its fitness-for-duty policy "is based on medical evidence that indicates that separation from the workplace is very strongly associated with negative impacts on mental health and functionality." D. 47-2 ¶ 4 & n.1 (citing Separation from the Workplace). The research BPD

12

cites, however, concerns negative health outcomes associated with being unemployed, not temporary workplace separation due to illness or injury, which is at issue here. See Separation from the Workplace at 58–60. Even if the Court were to credit Dr. Brown's brief summary of his own anecdotal observations about the negative psychological impact of extended leave, D. 47-2 ¶ 4, there is nothing in the record to explain why BPD requires examinations after three and six months of leave. That is, BPD has not shown a legal basis for the specific timing of the examinations at three months and six months and not some shorter or greater duration. Counsel for BPD asserted at the motion hearing that Dr. Brown's affidavit explains it is "industry standard" to conduct fitness-for-duty examinations at three and six months, but this is not supported by the record. Indeed, Dr. Brown's affidavit contains no reference to a standard schedule of post-leave examinations as to any industry, let alone law enforcement, or any factual basis for same. See D. 47-2.

Although BPD has an interest in ensuring that officers are fit to work, BPD has "fail[d] to demonstrate that it has reasonably defined the class affected by [its] policy." Port Authority, 283 F. Supp. 3d at 88. Similar to Port Authority, BPD, has not "offer[ed] any evidence showing that police officers who have been out on sick leave for more than [three or six months] would pose a safety risk or be unable to discharge their responsibilities when they return to work." Id. (citing Transp. Workers Union of Am., Loc. 100, AFL-CIO v. New York City Transit Auth., 341 F. Supp. 2d 432, 451 & n.90 (S.D.N.Y. 2004))); see Taylor v. City of Shreveport, No. CV 13-2227, 2016 WL 4468256, at *4 (W.D. La. Aug. 24, 2016) (ruling that police department's policy requiring inquiry into an officer's condition after a few sick days was "broader than necessary" because the inquiry was "not triggered by a legitimate, non-discriminatory reason to doubt an officer's capacity perform his duties" (citing Pennsylvania State Troopers Ass'n v. Miller, 621 F. Supp. 2d 246, 257

13

(M.D. Pa. 2008))); Psak v. Bernhardt, No. CV 14-116 (RDM), 2020 WL 2849985, at *23 (D.D.C. June 1, 2020) (denying police department's motion for summary judgment as to officer's medical inquiry claim under the Rehabilitation Act and noting that "inquiries or examinations should normally be related to the specific medical condition for which the employee took leave" (internal quotation marks omitted) (quoting Scott v. Napolitano, 717 F. Supp. 2d 1071, 1083 (S.D. Cal. 2010))). "[A]n employer may not use the employee's leave as a justification for making far-ranging disability-related inquiries." Psak, 2020 WL 2849985, at *23 (quoting Scott, 717 F. Supp. 2d at 1083).

Indeed, "it *may* be proper for an employer to require an employee to undergo a medical examination after a medical absence of more than thirty days, but not necessarily." Macchiarella v. Indiana Harbor Belt R.R., No. 2:15-CV-7-PRC, 2016 WL 11605341, at *8, *12 (N.D. Ind. Nov. 7, 2016) (emphasis in original) (granting summary judgment for plaintiff on Section 12112(d)(4)(A) claim where the defendant had argued "that an extensive medical leave of absence qualifies as an objective basis for requiring a medical examination before the employee can resume job duties"). Similar to the defendant in Macchiarella, BPD "cites no case law supporting a blanket return-to-work medical examination policy that does not also incorporate an individualized assessment leading to a reasonable belief based on objective evidence that the employee cannot safely perform essential job functions or is a direct threat due to a medical condition." Id. (citing Wright, 798 F.3d at 523). Furthermore, BPD has not shown that subjecting an officer to a psychological examination with Dr. Brown, after they have already been cleared to work by their own physician and a BPD clinician, D. 47-1 at ¶ 15, constitutes a business necessity under the ADA. See Taylor, 2016 WL 4468256, at *6 (stating that "the Court can find no vital interest in [the police department] needing to further test [an] officer" who has already been cleared for work).

While out-of-circuit cases are not binding authority, the Court finds this case law persuasive in so much as it pertains to fitness-for-duty examinations unmoored to the recovery from any injury that lead to the leave[6] or specific concerns about the officer's medical or psychological fitness for return to duty.  Moreover, as this line of cases makes clear, BPD is not without recourse if it has concerns about a particular officer's fitness for duty before they return to work.   See Brownfield, 612 F.3d at 1145 (noting that "the ADA does not require a police department to forego a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries" (internal quotation marks omitted) (quoting Watson, 177 F.3d at 935)).

The Court, therefore, concludes that BPD has not shown that its blanket policy requiring physical examinations after three months of leave and both physical and psychological examinations after six months of leave without any further showing is consistent with business necessity and, therefore, violates 42 U.S.C. § 12112(d)(4)(A).

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Plaintiffs' motion for partial summary judgment, D. 40, and DENIES BPD's cross-motion for partial summary judgment, D. 47.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[6] Such showing would be satisfied, as Plaintiffs do not dispute, D. 41 at 5 n.1 (clarifying no challenge to examination to confirm recovery from a workplace injury before return to work), if the examination was to confirm recovery from an injury that led to the leave.

15